**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Todd Graham, *et al.*, ) | CASE NO. 1:16 CV 2366 |
| ) | |
| Plaintiffs, ) | JUDGE PATRICIA A. GAUGHAN |
| ) | |
| Vs. ) | |
| ) | |
| Richard Fearon, *et al.*, ) | **Memorandum of Opinion and Order** |
| ) | |
| Defendants. ) | |

**INTRODUCTION**

This matter is before the Court upon Defendants' Motion to Dismiss (Doc. 25). This putative class action arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. Plaintiffs, former employees of Eaton Corporation Plc ("Eaton"), are participants in the Eaton Savings Plan (the "Plan") and, in particular, the Eaton Company Stock Fund (the "Eaton Stock Fund" or the "Fund"). The Eaton Stock Fund is an employee stock ownership plan ("ESOP") that invests primarily in Eaton common stock. Plaintiffs claim that Defendants, named fiduciaries of the Plan, breached their fiduciary duties by doing nothing to protect Plaintiffs' retirement savings from harm even though Defendants were allegedly aware that the stock was

1

artificially inflated in value due to alleged fraud and misrepresentation by Eaton executives. For the following reasons, Defendants' motion is GRANTED.

Also before the Court is Defendants' Request for Judicial Notice (Doc. 26), which asks the Court to take judicial notice of documents incorporated by reference into the Complaint, Plan documents, publicly available documents, stock analysts' reports, and news articles. These documents meet the requirements of Federal Rule of Evidence 201, and Plaintiffs do not oppose Defendants' request. As such, the request is GRANTED.

**BACKGROUND**

Eaton is an Ireland-based manufacturer of engineered products marketed to customers in the industrial, agricultural, construction, aerospace, and vehicle markets. The company's products include hydraulic equipment, fluid connectors, electrical distribution equipment and engine components. Eaton's stock shares trade on the New York Stock Exchange Inc. (Compl. ¶ 9).[1] Plaintiffs allege that they each purchased and held shares of Eaton stock through the Eaton Stock Fund in their Plan retirement savings account during the putative class period, November 13, 2013, through July 28, 2014. Defendants are officers of Eaton and fiduciaries of the Plan.[2]

On May 21, 2012, Eaton acquired Irish-headquartered Cooper Industries Plc. ("Cooper"). (*Id.* ¶ 57). According to the Complaint, under the merger agreement with Cooper, "Eaton would acquire Cooper through the formation of a new Irish holding company, resulting in Eaton's

---

[1] Eaton is not a defendant in this case.

[2] Defendants are Richard Fearon, Chief Financial Officers and Chief Planning Officer; Ken D. Semelberger, Senior Vice President and Controller and Chief Accounting Officer; Trent Meyerhoefer, Senior Vice President and Treasurer; and Mark McGuire, Senior Vice President and General Counsel.

reincorporation in Ireland and the re-domiciling of its headquarters from Cleveland, Ohio to Dublin, Ireland–a change that purportedly allowed Eaton to lower its corporate tax rate." (*Id.*).

Following the merger, during investor conference calls, analysts asked Eaton executives whether it was feasible for Eaton to engage in a spin off of its vehicle business given the post-merger regulatory environment. (*Id.* ¶ 58). Plaintiffs allege that Eaton executives led analysts to believe that a spin off of the vehicle business could be done without negative tax consequences. For example, Eaton held an investor call on May 21, 2012, to discuss the merger. During the call, an analyst asked Alexander M. Cutler, Chairman and CEO of Eaton, "Are you precluded by any element of the tax structure of the deal to spin off the truck and automotive part at any time?" In response, Cutler stated, "there is nothing in the deal per se that would prevent us from taking portfolio moves, but we have no such plans." (*Id.* ¶ 59). Plaintiffs allege that throughout the remainder of 2012 and in 2013, Eaton executives continued to deny that any regulatory restrictions prevented a spin off. (*See id.* ¶¶ 60-65). They further allege that, in the first half of 2014, Eaton's disclosures on its SEC forms did not disclose that a divestiture of its vehicle business would pose any tax problems for the company. (*Id.* ¶¶ 66-68). According to Plaintiffs, analysts began to anticipate that Eaton was nearing a spin off of the business. (*Id.* ¶ 64) (alleging that, on October 28, 2013, a UBS analyst asserted that "[w]e [] believe a spin off or sale of the [Eaton] Vehicle segment is possible over the next 12-18 months and could be a positive catalyst for the stock").

Plaintiffs do not, however, allege that any Eaton executives stated that Eaton was planning a spin off of its vehicle business. In fact, they admit that, on the day the Cooper acquisition was announced, Cutler denied that the company had such plans. (*Id.* ¶ 59). After the

3

acquisition, Eaton executives continued to inform analysts that the company did not have plans to sell its vehicle business. *See* 2012 Goldman Tr. at 6 (Cutler: "We really like the balance of the business as we have and we've never been more bullish on the prospects in our automotive and our truck businesses.") (Fiorella Decl. Ex. 2); 2013 Goldman Tr. at 8 (Fearon: "The automotive business...is a very high return business...and we really don't see a strong case to be made for changing right now.") (Fiorella Decl. Ex. 3); *see also* Deutsche Bank, *ETN Report*, at 2 (7/30/2014) ("the company has maintained that investors should not expect significant additional portfolio actions (ie, [*sic*] sale or spin)") (Fiorella Decl. Ex. 6).

Plaintiffs allege that the company's stock became artificially inflated as a result of Eaton executives' "false and misleading representations...assur[ing] investors and the market of the continued feasibility of divesting the company's automobile-part manufacturing business on a tax-free basis." (Compl. ¶¶ 12). They claim that Defendants knew or should have known that the stock was artificially inflated by fraud. (*Id.* ¶¶ 19-20). When Cutler ultimately informed investors on July 29, 2014, that Eaton could not do a tax-free spinoff for five years, the price of Eaton shares dropped from $76.75 per share to $70.51 per share, or 8.13%, in one day. (*Id.* ¶¶ 69-71). In the following months, the stock price fell further to $61 per share. (*Id.* ¶ 72).

Plaintiffs claim that Plan participants who chose to purchase the Eaton Stock Fund paid fraudulent, excessive prices for the stock during the Class Period and suffered financial harm to their retirement savings by over-paying for Eaton stock (*Id.* ¶ 25). They bring one claim for failure to prudently manage the Plan's assets, alleging that Defendants violated this duty by doing "nothing to protect the retirement savings of the Plan participants...from harm as the result of the undisclosed fraud and inflation of Eaton's stock price." (*Id.* ¶ 79). They assert that

4

Defendants should have halted new contributions or investments into the Eaton Stock Fund, issued truthful or corrective disclosures to cure the fraud, or directed the Eaton Stock Fund to divert a portion of its holdings into a low-cost hedging product to serve as a buffer to offset some of the losses. (*Id.* ¶ 22). Defendants move to dismiss Plaintiffs' Complaint. Plaintiffs oppose the motion.

**STANDARD OF REVIEW**

When considering a motion to dismiss under Rule 12(b)(6), the allegations of the complaint must be taken as true and construed liberally in favor of the plaintiff. *Lawrence v. Chancery Court of Tenn.,* 188 F.3d 687, 691 (6th Cir. 1999). Notice pleading requires only that the defendant be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47. However, the complaint must set forth "more than the bare assertion of legal conclusions." *Allard v. Weitzman* (*In Re DeLorean Motor Co.*)*,* 991 F.2d 1236, 1240 (6th Cir. 1993). Legal conclusions and unwarranted factual inferences are not accepted as true, nor are mere conclusions afforded liberal Rule 12(b)(6) review. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009). Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489-490 (6th Cir. 1990).

In addition, a claimant must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1955 (2009). Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it stops short of the line between possibility and plausibility of "entitlement to relief."

*Id*. at 1949 (citations and quotations omitted).

## LAW AND ANALYSIS

ERISA imposes a duty of prudence on plan fiduciaries, which requires a plan fiduciary to act solely in the interest of plan participants and with the care, skill, prudence, and diligence of a prudent man. 29 U.S.C. § 1104(a). In general, plan fiduciaries are to diversify plan investments so as to minimize the risk of large losses. *Id.* In *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), the Supreme Court addressed how the duty of prudence applies in the context of an ESOP plan, which is "designed to invest primarily in" the stock of the participants' employer and is thus "*not* prudently diversified." *Id.* at 2465 (quoting 29 U.S.C. § 1107(d)(6)(A)). The Court held that the same standard of prudence applies to all ERISA fiduciaries, including ESOP fiduciaries, "except that an ESOP fiduciary is under no duty to diversify the ESOP's holdings." *Fifth Third*, 134 S. Ct. at 2467.

The Court noted that a motion to dismiss is an "important mechanism for weeding out meritless claim[s]" against ESOP fiduciaries and announced the pleading requirements that a plaintiff who sues an ESOP fiduciary for breach of the duty of prudence must meet to survive such a motion. Where a plaintiff claims that the breach is on the basis of nonpublic information

6

(i.e., information that was available to the fiduciary because he or she was a company insider)[3], a plaintiff must plausibly allege: "[1] an alternative action that the defendant could have taken that would have been consistent with the securities laws" and "[2] that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Id.* at 2472. In addressing whether a complaint meets this test, "courts should consider the extent to which an ERISA-based obligation either to refrain on the basis of inside information from making a planned trade or to disclose inside information to the public could conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws." *Id.* at 2473. The Court also directed lower courts to engage in "careful, context-sensitive scrutiny of a complaint's allegations" to determine whether the complaint states a claim that the defendant acted imprudently. *Id.* at 2470-71.

Following *Fifth Third*, the Supreme Court addressed this issue again in *Amgen Inc. v. Harris*, 136 S. Ct. 758 (2016). There, the plaintiffs alleged that Amgen, a pharmaceutical company, concealed unfavorable information about a drug and that when the information became public, Amgen's share price declined. They claimed "that fiduciaries of Amgen's stock-ownership plans knew or should have known that the stock was overvalued based on inside information, and should have either removed the Amgen stock as an investment option or revealed to the general public" the unfavorable information. *Harris v. Amgen, Inc.*, 788 F.3d 916, 924 (Kozinski, J., dissenting from denial of rehearing en banc). The Ninth Circuit determined that these allegations met *Fifth Third's* standards because it was plausible that the defendants

---

[3]  Plaintiffs have not alleged that Eaton officers should have recognized from public information that Eaton's share price was inaccurately valued.

7

could remove the company stock from the list of investment options without causing undue harm to plan participants. The Supreme Court reversed, clarifying that courts cannot presume that a plaintiff's proposed alternatives would satisfy *Fifth Third*. Rather, "the facts and allegations supporting that proposition should appear in the stockholders' complaint." 136 S. Ct. at 760 (remanding to district court to determine if plaintiffs could amend their complaint to satisfy *Fifth Third*).

### 1. Halting New Investments and Disclosure

Plaintiffs allege as alternative actions that Defendants could have halted new purchases of Eaton stock in the Eaton Stock Fund or issued corrective disclosures to cure the alleged fraud. Even assuming that these alternatives would have been consistent with the securities laws, they do not meet the second prong of *Fifth Third* because Plaintiffs have failed to plausibly allege that a prudent fiduciary in Defendants' circumstances would not have viewed these options as more likely to harm the Fund than to help it.[4]

In *Fifth Third*, the Supreme Court noted that a lower court must carefully scrutinize a complaint's allegations to determine whether a prudent fiduciary could "conclude[] that stopping purchases–which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment–or publicly disclosing negative information would do more harm than

---

[4] Plaintiffs acknowledge that temporarily closing the fund "might have necessitated a public disclosure under the securities laws." As Defendants note, halting purchases in the Fund without disclosing the decision or the underlying reasons for doing so could have subjected them to insider trading liability. The failure to make such a disclosure would have meant that they were using inside information to benefit one group of shareholders (Plan participants) over other shareholders. Plaintiffs do not address this argument, and as noted, concede that Defendants would have had to disclose their decision to freeze investments.

good by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Fifth Third*, 134 S. Ct. at 2473. Freezing investments and corrective disclosures are the alternative actions that plaintiffs typically allege in ESOP stock drop cases. Since *Fifth Third*, courts have consistently held that complaints alleging these alternatives fail to meet the second prong of *Fifth Third*. In *Amgen*, for example, the Supreme Court held that the complaint failed to include specific facts and allegations to support that removing the Amgen Common Stock Fund from the list of available options was an alternative action that could plausibly have satisfied *Fifth Third*. *Amgen*, 136 S. Ct. at 760. *See also Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016) ("it does not seem reasonable to say that a prudent fiduciary at that time could not have concluded that (1) disclosure of ... information [regarding numerous undisclosed safety breaches prior to the Deepwater Horizon explosion] to the public or (2) freezing trades of BP stock–both of which would likely lower the stock price–would do more harm than good"); *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016) (affirming dismissal of complaint because it did not "plausibly plead facts and allegations showing that a prudent fiduciary during the class period 'would not have viewed [disclosure of material nonpublic information regarding Lehman or ceasing to buy Lehman stock] as more likely to harm the fund than to help it'"). In their reply brief, Defendants cite to ten cases post-*Amgen* dismissing ERISA complaints (or affirming dismissal of such complaints) where the plaintiffs alleged disclosure or freezing trades of company stock as alternative actions. (*See* Defs.' Reply at 1); *see also In re BP P.L.C. Sec. Litig.*, 2017 WL 914996 (S.D. Tex. Mar. 8, 2017). To the contrary, Plaintiffs have cited no case post-*Amgen* that has survived a Rule

9

12(b)(6) motion to dismiss where *Fifth Third* has been applied to these alternatives.[5]

With respect to halting new investments in the company stock, Plaintiffs do not point to any specific facts in their Complaint that plausibly allege that a prudent fiduciary in the same situation could not have determined that freezing trades would be more likely to harm the Fund than to help it. Indeed, in their brief in opposition, they do not even address Defendants' argument that halting new investments fails the second prong of *Fifth Third*. As the Supreme Court recognized, halting investment in a company fund can cause the market to infer that "insider fiduciaries view[] the employer's stock as a bad investment," resulting in a drop in stock price. Plaintiffs have done nothing to allege that a prudent fiduciary in Defendants' position would not have taken this into consideration and concluded that freezing trades of Eaton stock could do more harm than good.

As for corrective disclosure, Plaintiffs allege that "if Defendants had tried to effectuate corrective public disclosure near the very beginning of Eaton's fraud–at the beginning of the Class Period–almost all of the artificial inflation of Eaton's stock price that occurred could have been avoided, and virtually no Plan participants who purchased shares of the Eaton Stock Fund would have been harmed." (Compl. ¶ 82) (citing Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages on the Market Cases*, 37 UCLA L. Rev. 883, 911

---

[5]   (*See* Pls.' Mem. in Opp. at 15) (citing *Murray v. Invacare Corp.*, 125 F. Supp. 3d 660 (N.D. Ohio 2015) (relying on Ninth Circuit's decision in *Amgen*, which was reversed by the Supreme Court); *Ramirez v. J.C. Penney Corp.*, 2015 WL 5766498 (E.D. Tex. Sept. 29, 2015) (pre-dating *Amgen*); *In re Suntrust Banks, Inc. ERISA Litig.*, 2016 WL 4377131 (N.D. Ga. Aug. 17, 2016) (involving class certification and other issues unrelated to the sufficiency of the pleadings); *Brannen v. First Citizens Bankshares Inc.*, 2016 WL 449458 (S.D. Ga. Aug. 26, 2016) (declining to apply *Fifth Third* to a failure-to-investigate claim)).

(1990)). They claim that reputational damage to Eaton for engaging in prolonged fraud caused the stock to suffer a harsher correction in price than it would have if the alleged fraud had been disclosed at the outset. (*Id.* ¶ 84) (citing Jonathan M. Karpoff, D. Scott Lee, and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, J. of Fin. and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2003)).

But courts have routinely rejected the allegation that "the longer a fraud goes on, the harsher the correction" as support for corrective disclosure as a plausible alternative. Such an "assertion[] [is] not particular to the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence." *JP Morgan Case & Co. Erisa Litig,* 2016 WL 110521, at *4 (S.D.N.Y. Jan. 8, 2016), aff'd sub nom. *Loeza v. John Does 1–10*, 659 F. App'x 44 (2d Cir. 2016); *Jander v. Int'l Bus. Machines Corp.*, 2016 WL 4688864, at *5 (S.D.N.Y. Sept. 7, 2016) ("Plaintiffs' argument that delay in disclosing an alleged fraud always harms investors in the Plan is not 'particular to the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence.'").[6] Instead, courts recognize that, given the negative impact of disclosure, a prudent fiduciary "could very easily conclude that such [an] action[] *would* do more harm than good." *Whitley*, 838 F.3d at 529. This is particularly true

---

[6] Plaintiffs argue in their brief in opposition that the stock price did not bounce back quickly after disclosure of the alleged fraud and that this supports their argument that the reputational damage caused by the late disclosure was significant. But they did not include such an allegation in their Complaint and do not explain how a prudent fiduciary in Defendants' circumstances could have known that the stock price would not rebound quickly following disclosure. In their Complaint, plaintiffs rely only on two law review articles to support their contention regarding reputational harm and fail to cite any facts particular to this case. *See BP P.L.C. Sec. Litig.*, 2017 WL 914996, at **4-6 (finding that even where the plaintiff attempted to quantify the effect of making an earlier disclosure through expert analysis, this was insufficient to meet prong two of *Fifth Third*).

where an "unusual" disclosure outside the securities laws' normal reporting regime could "spook" the market, causing a more significant drop in price than if the disclosure were made through the customary procedures. *BP P.L.C. Sec. Litig.*, 2017 WL 914996, at *5. And, as Defendants point out, the securities laws do not contemplate that a company will continuously disclose material information. (*See* Defs.' Mem. at 14). For these reasons, even if Defendants were aware of fraudulent activity that inflated the value of Eaton's stock, Plaintiffs have failed to plausibly allege that they could not have concluded that corrective disclosure would have done more harm than good.

### 2. "Hedging Product"

Plaintiffs' third alternative is that Defendants should have directed a portion of the Eaton Stock Fund's holdings into a low-cost hedging product that they allege would have mitigated the harm to Plaintiffs once Eaton's alleged fraud was revealed. (Compl. ¶¶ 104-07). This alternative also fails to meet *Fifth Third's* requirements.

Plaintiffs' arguments notwithstanding, this alternative suggests that Defendants had a duty to diversify the Fund's holdings. But, as noted above, the Supreme Court in *Fifth Third* held that ERISA fiduciaries are statutorily exempt from such a duty. 134 S. Ct. at 2467. Even more importantly, Plaintiffs' failure to identify what hedging product Defendants should have invested in–whether it was a short position in Eaton stock, an insurance product, or something else–dooms their claim. Plaintiffs ask the Court to assume that it would have been legal for Defendants to purchase the unspecified hedging product without disclosing the purchase, that the product would have been "low cost," and that it would have "soften[ed] the blow to Plan

participants that would come when the fraud was finally revealed." (Compl. ¶ 105).[7] But *Fifth Third* requires more than assumptions and speculation to show that a proposed alternative meets both prongs of the test. Rather, "the facts and allegations supporting that proposition should appear in the stockholders' complaint." *Amgen*, 136 S. Ct. at 760. Plaintiffs' Complaint contains no such facts and allegations. Thus, Plaintiffs have not plausibly alleged that purchasing an unidentified hedging product would have been consistent with the securities laws or that a prudent fiduciary in Defendants' circumstances would not have viewed making such a purchase as more likely to harm the fund than to help it.

### 3. Leave to Amend

In their brief in opposition, Plaintiffs seek leave to amend if the Court grants Defendants' motion so that they "may cur[e] the defects in the original pleading." (Pls.' Br. in Opp. at 22). They do not articulate the facts that they would allege or how they would cure the defects in their Complaint. Such a perfunctory request, inserted at the end of an opposition brief, without giving the Court any reason to believe that an amended complaint would be anything other than futile, is improper. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004) ("[A] bare request in an opposition to a motion to dismiss–without any indication of the particular grounds on which amendment is sought...does not constitute a motion within the contemplation of Rule

---

[7] As Defendants point out, Plaintiffs have not plausibly alleged that the purchase of the unidentified hedging product could be kept secret. Had Defendants not disclosed the purchase or the reasons for making it, they might have been liable under the securities laws for manipulating the market in favor of Fund participants. Moreover, the Plan documents are public records. Once the purchase became public, the stock price would likely suffer. For all of the reasons discussed above, a prudent fiduciary could have easily concluded that purchasing a hedging product would, therefore, cause more harm than good.

15(a)."); *see also Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2000) (noting that plaintiffs are "*not entitled to an advisory opinion from the Court informing them of the deficiencies* of the complaint and then an opportunity to cure those deficiencies) (emphasis in original). Plaintiffs' request is therefore DENIED.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. 25) is GRANTED.

IT IS SO ORDERED.

                                               /s/ Patricia A. Gaughan
                                               PATRICIA A. GAUGHAN
                                               United States District Judge

Dated: 3/24/17